Argued February 25; affirmed March 24, 1936

COOL ET AL. *v.* SCHWEBERGER

(55 P: (2d) 796)

*B. G. Skulason,* of Portland, for appellant.

*C. O. Fenlason* and *Arthur A. Goldsmith,* both of Portland, for respondents.

CAMPBELL, C. J. This is an action on a promissory note dated January 28, 1930, in the sum of $20,000, payable, in installments, on or before three years after date with interest at 7 per cent per annum.

It is alleged in the complaint that the sum of $2,000 was paid on October 26, 1930, and that by mutual agreement certain personal property on which defendant gave a chattel mortgage to secure the payment of said note was sold for the sum of $4,268.25, and that amount credited on the note; that there was due the sum of $15,307.82 with interest, for which plaintiffs prayed judgment.

Defendant filed an answer which in effect admitted the execution of the note and the payments made

thereon, and alleged for a further and separate answer and defense that defendant was induced to execute said note by fraud and fraudulent representations. It is alleged that defendant entered into an agreement with the Harty Manufacturing Company to buy all its assets for the sum of $25,000—$5,000 to be paid in cash at the date of delivery, and the balance evidenced by the $20,000 note, the subject of this action. Under the terms of an agreement, the note was made payable to plaintiffs herein; that according to the terms of said agreement this defendant received a bill of sale of said assets and immediately took possession thereof (among the assets was a wood-products manufacturing plant) and operated said plant until March, 1931, when he abandoned the same.

It is further alleged that defendant was induced to enter into said contract of purchase and to execute said promissory note by the following false and fraudulent representations: (1) That certain orders for merchandise claimed to be owned by the Harty Manufacturing Company and sold to defendant were all bona fide and worth the sum of $44,000; (2) that the twenty-seven trucks mentioned in the bill of sale were owned by the said company; (3) that the machinery in said plant and mentioned in the bill of sale was worth $22,000; (4) that the accounts receivable were worth $5,000; (5) that the lumber on hand was worth $10,000; (6) that the earned freight due from transportation companies was worth $3,000; (7) that the lower system installed in said plant, when paid for, might be removed; (8) that the interest in the Tacoma Fir Door Company was worth the sum of $12,500, subject to a mortgage of $5,000; (9) that the plant and business were profitable and its operation was then being carried on at a profit.

It is then alleged that said representations were false and known to the Harty Manufacturing Company and to plaintiffs to be false, and were made with the intention of misleading and deceiving defendant, and that defendant had no knowledge of their falsity but believed them and relied upon them and was induced thereby to enter into said contract and execute said note.

It is further alleged that said representations were false in that: (1) The said orders for merchandise were not bona fide and were worthless; (2) that said corporation did not have title to said twenty-seven trucks; (3) that the machinery was not worth in excess of $7,500, and that plaintiffs and the Harty Manufacturing Company purposely concealed the broken condition of part of the same from defendant; (4) that the accounts receivable were not worth in excess of $3,000; (5) that said lumber was not worth in excess of $6,000; (6) that there was nothing due from transportation companies; (7) that the blower system in the plant was a fixture and could not be removed; (8) that the equity of the Harty Manufacturing Company in the Tacoma Fir Door Company was worth only $4,500 and that said sum was applied on said $5,000 mortgage after sale to defendant; (9) that the plant and business sold to defendant was not profitable and was not being operated at a profit but was being operated at a loss.

He further alleged that the property he purchased was of no value except in connection with said plant.

To this answer, plaintiffs filed a reply in which they denied all fraud or fraudulent representations and alleged that every opportunity was afforded to defendant to make a thorough independent investigation of the matter and that he did so by himself and through his expert agents employed by him for that purpose,

and that in making the purchase he relied solely on his own judgment in entering into the contract and executing the said note. The cause came on regularly for hearing before a jury. At the close of all the testimony the plaintiffs moved for a directed verdict in their favor in the full amount asked for. The court granted the motion and a verdict was returned accordingly. Judgment was entered thereon. Defendant appeals.

The Harty Manufacturing Company was organized as a corporation under the laws of the state of Oregon in June, 1929. It had an authorized capital of $25,000, all of which was issued and outstanding in February, 1930, at the time its assets were sold to the defendant herein. It was engaged in the business of manufacturing doorframes, window sash, mouldings, table legs, and similar wood products. The plant was operated by the corporation for about eight months during which time its operating loss was $7,380.19. About $4,000 of this loss is accounted for by plant depreciation and losses on collections. Its liabilities, secured and unsecured, amounted to approximately $65,000. It reported its assets at $82,536.53. This was the financial statement prepared and issued by Lybrand, Ross Brothers & Montgomery, accountants and auditors. The corporation acquired stock of the Tacoma Fir Door Company of the par value of $10,000. The company during its operation was not paying its obligations as they became due.

The creditors formed a committee known as the Harty Creditors' Committee. J. E. Cool, C. E. Price, Hugh Miller, and E. J. Swindells, plaintiffs herein, were selected as this committee. This committee selected Arthur A. Goldsmith, Esquire, as its attorney. John Schweberger, defendant herein, was operating the Zoss Ladder Works. The Harty Manufacturing Company's

plant was evidently turned over to the creditors' committee. This committee was anxious to make a sale thereof. Shortly after Mr. Goldsmith was appointed as attorney, he called up defendant and tried to interest him in the purchase of the plant. He informed defendant that he was the attorney for the creditors' committee and that he could not act for defendant. After some negotiations and investigation, defendant decided to buy the plant for the sum of $25,000—$5,000 to be paid in cash and the balance to be represented by the defendant's note for $20,000.

Defendant was given a bill of sale which conveyed to him all of the interests of the Harty Manufacturing Company; all its assets tangible and intangible. He agreed to pay the balance due on outstanding conditional sales contracts which were specified in the bill of sale and certain other specifically mentioned obligations. Defendant thereupon took possession of the plant and began its operation.

The financial depression was still much in evidence and he operated the plant at a loss. He continued its operation until April, 1931, and then determined to move it to Klamath Falls, Oregon, so as to be nearer the source of supply of the kind of lumber that he used. There was a meeting of the creditors' committee and defendant, in which the committee gave its consent for the removal of the plant to Klamath Falls. However, he was unable to make satisfactory arrangements with his parties at Klamath Falls and his negotiations to remove the plant fell through. Defendant thereupon ceased operations and abandoned the plant.

Defendant assigns as error the action of the court in directing a verdict in favor of plaintiffs.

At the time of the transaction, defendant was about fifty-five years of age; in full possession of his facul-

ties. He had considerable business experience. At one time he operated 27 shoe repair shops, employing about 70 men, throughout the states of Idaho and Utah, sometimes doing as much as $150,000 gross business per year. At the time of the transaction herein, he was the principal owner and operator of the Zoss Ladder Works in Portland, Oregon, in which he used considerable lumber and was somewhat familiar with the lumber business.

He testified that Arthur Goldsmith had been his personal attorney, also the attorney for the Zoss Ladder Works, and that he and Mr. Goldsmith had become "bosom friends"; that in the negotiations, which extended over two weeks, leading up to the execution of the note in suit, Mr. Goldsmith was not representing him. He testified that Mr. Goldsmith called him to his office, over the phone, and, when he arrived at the office, Goldsmith informed him:

"* * * he wanted to talk to me. And when I got in there he says, 'John, I have a chance here for you to make some good money. Here is a business which I represented for the last several weeks, and which I have run myself, and I have figures here showing what bills I paid—I paid every bill, and I received every penny of money and distributed for the creditors' committee, and I have figures here showing that I have made money, and the concern which is a going concern, is making money now, but are short of funds, of capital. They have a file'—he showed me a file of orders, and he says, 'There is over forty-four thousand dollars worth of orders here on hand and no money to buy the lumber with and fill the orders, which if you put some of your money in and some of your time to supervise the management will make you good money, I know, from the figures.' "

Defendant advised Goldsmith that he would have to borrow the money and that such business (the Harty

Manufacturing Company) was not in his line. He testified further that Goldsmith then said to him:.

"The men who are running it, Mr. Harty and Mr. Brown, his secretary and superintendent, have been in that business all their lives. They are honest, upright and conscientious and have made money. But they had a fire last year in Tacoma where they was established, and the factory burned down, which brought a loss, and one of the partners died and his wife drawed his share of the money out, which crippled them financially, and if you put your money in they will run it for you as good as they do for themselves, and make money for you."

He further testified that he did not buy at that time; that, a few days later, he was again called to Goldsmith's office and was told by Mr. Goldsmith:

"New orders are coming in all the time to me here, because I am handling it for the creditors' committee and for the Harty Manufacturing Company, and I have both sides here, and we are making money every day on it."

To this, he replied: "I am going to Seattle and I will think it over."

Sometime later, he again called at Goldsmith's office in company with a Mr. DePenning, an expert in similar wood-working lines, whom he had employed to advise him in the instant transaction. They were told by Mr. Goldsmith: "Go out and see the plant."

He further testified that Goldsmith told him that the Harty Manufacturing Company was in financial difficulties. He showed him a sheet with figures on it and told him that the company was heavily involved with its finances. He also informed defendant and DePenning that the Harty Manufacturing Company had lost money while the plant was in operation. Defendant also testified that he was given every oppor-

tunity to inspect everything that he purchased; that he employed Mr. DePenning as an expert to assist him in making this investigation. He and his expert "went through the plant from end to end".

They were dealing at arms length. No fiduciary relationship existed between defendant and Goldsmith. The doctrine of "buyer beware" applies: *Reimers v. Brennan*, 84 Or. 53 (164 P. 552); *Milton v. Hare*, 130 Or. 590 (280 P. 511).

Defendant took possession of the plant and continued to operate it for eight months. He paid one installment of $2,000 on the note. He testified that he discovered the misrepresentations within two or three days after he took possession: *Shappirio v. Goldberg*, 192 U. S. 232 (24 S. Ct. 259, 48 L. Ed. 419); *viegler v. Stinson*, 111 Or. 243 (224 P. 641); *Linebaugh v. Portland Mortgage Company*, 116 Or. 1 (239 P. 196); *Elliott v. Mork*, 144 Or. 246 (24 P. (2d) 1036); and see note to *Rothermel v. Phillips*, 292 Pa. 371 (141 Atl. 241, 61 A. L. R. 492 at page 537).

Defendant claims that the orders for merchandise which the Harty Manufacturing Company had on hand, at the time of the sale, were not bona fide. He was shown these orders and given access to them and nothing was done to prevent him from making a full investigation.

His next complaint is that Goldsmith represented to him that the machinery in said plant was worth the sum of $22,000. He does not establish by evidence what the actual value of the machinery was. He says on examination that there were breakages, but he had an opportunity to examine said machines.

Defendant also had an opportunity to examine the accounts receivable.

"He told me there was five thousand dollars in accounts receivable which was good, and he says, 'If you don't feel like taking them we would be willing to give credit on the note of the Harty Manufacturing Company to the Portland Industries Financing Company,' who own—who had a note from Harty of $5,000 which I had to take over. And he says, 'If you don't feel like you want to take that five thousand dollars bills receivable we will give you credit on the note.' "

He was given an opportunity to examine the lumber on hand and its condition. It would have been an easy matter for him to find out the amount of freight earned as "mill in transit".

There is some dispute in the evidence regarding the ownership of hand-trucks used about the lumber yard. Defendant was not denied the use of any of them.

Defendant testified that he was informed that the plant was making money, but he was also informed that it lost money every month it was operated by the Harty Manufacturing Company. He knew that it was involved financially and in the hands of a creditors' committee who were trying to liquidate the business. He made his own investigation. By the exercise of reasonable care he could have discovered the facts about the blower system and the truck.

As was said in *Seigler v. Stinson*, supra:

"These things were all open, patent, and visible; and could have been discovered by plaintiff by the exercise of ordinary observation, and he is charged with all the knowledge concerning the same that he could have acquired had he made a thorough and complete investigation of them as he was bound to do."

It was not error for the court to have directed a verdict in favor of plaintiff. The judgment of the circuit court will be affirmed.

It is so ordered.

BAILEY, BEAN and RAND, JJ., concur.